Henry JESSEN, Plaintiff,

v.

Howard O'DANIEL, Administrator with the Will Annexed of the Estate of John T. O'Daniel, Deceased, Defendant and Cross-Complainant,

v.

NATIONAL FARMERS UNION PROP-ERTY & CASUALTY COMPANY, a corporation, Cross-Defendant.

Civ. No. 221.

United States District Court
D. Montana,
Billings Division.

Nov. 6, 1962.

Hugh J. Lemire, Miles City, Mont., for plaintiff.

Colgrove & Brown, Miles City, Mont., for defendant and cross-complainant.

White & Steele, Denver, Colo., and Wiggenhorn, Hutton, Schiltz & Sheehy, Billings, Mont., for cross-defendant.

JAMESON, District Judge.

On July 11, 1958, plaintiff instituted this action in the District Court of Custer County, Montana, to recover $35,000.00, with interest, from the estate of John T. O'Daniel, deceased, on a judgment entered against O'Daniel by the District Court of Garfield County, Montana, on October 14, 1957, in a personal injury action arising from a truck-automobile collision on November 4, 1954. On that date O'Daniel was insured under a policy issued by the cross-defendant (hereinafter referred to as National) for bodily injury to one person in the limit of $10,000.00. The defendant filed an answer and cross-complaint against National. On June 3, 1959, National removed the action to this court on the ground of diversity of citizenship.

The Garfield County judgment was affirmed by the Supreme Court of Montana on February 5, 1960, 136 Mont. 513, 349 P.2d 107. On March 17, 1960, National paid to plaintiff the sum of $11,509.17, representing the policy limit of $10,000.00, plus interest and costs. On June 2, 1960, judgment was entered in the District Court of Custer County, Montana, in favor of plaintiff and against the defendant in the sum of $40,733.78.

Defendant and cross-complainant seeks to recover from National the amount of the judgment, with interest, entered by the District Court of Garfield County, Montana, in favor of plaintiff and against O'Daniel, in excess of the policy limit.

It was admitted that National retained James P. Lucas, an attorney at Miles City, Montana, to represent O'Daniel in the personal injury action; that Lucas conducted the defense of this action; that the policy of insurance provided that the company could "make such investigation, negotiation and settlement of any claim or suit as it deemed expedient"; and that prior to and during the trial of the personal injury action, plaintiff offered to settle his claim and cause of action for $9,000.00. The cross-complaint alleges that National, against the protest of O'Daniel, refused to cause the action to be settled for $9,000.00, toward which sum O'Daniel, though not bound to do so, offered to contribute voluntarily the sum of $2,000.00; and that National was negligent and guilty of bad faith in failing to negotiate the settlement and accept compromise offers within the limit of its policy.

The evidence consists of a rather voluminous exchange of correspondence between Lucas and National, the complete record in the personal injury action of Jessen v. O'Daniel, and oral testimony of plaintiff, Lucas, Howard O'Daniel, son of John T. O'Daniel, Roland L. Colgrove, counsel for plaintiff in Jessen v. O'Daniel and for both plaintiff and cross-complainant in this action, and Robert C. Hoth, assistant claims manager and suit examiner for National.

Exhaustive briefs have been filed by both parties, in which the facts are discussed in detail. Essentially there is little dispute with respect to the pertinent facts. There is sharp disagreement regarding the inferences and legal conclusions to be drawn from those facts.

At the outset, the court recognizes the obligation on the part of an insurer to exercise ordinary care and diligence in (a) investigating an accident and interviewing witnesses; (b) giving due consideration to applicable law; (c) making adequate preparation for trial; (d) appraising and evaluating the case from a settlement standpoint; and (e) negotiating for a settlement where a fair and honest appraisal of the case requires such action.

Cross-complainant first contends that National was guilty of negligence and bad faith in failing to make a reasonable and diligent investigation of the accident and the law applicable thereto. Both briefs discuss fully the evidence

bearing upon this contention. The opinion of the Montana Supreme Court in Jessen v. O'Daniel, supra, sets forth the facts pertinent to its conclusion that the evidence presented a jury case, and that viewing the evidence in the light most favorable to the plaintiff, the verdict of the jury could not be disturbed. After reviewing the evidence relating to National's investigation of the accident and applicable law, the briefs of counsel, and the decision of the Montana Court in Jessen v. O'Daniel, it is my conclusion that cross-complainant has failed to sustain his first contention.[1]

Cross-complainant contends further that National was negligent and guilty of bad faith in (a) failing to settle the case when it knew there was a strong possibility that the verdict would exceed the policy limits; (b) rejecting the advice of its own attorney and agent urging settlement; (c) failing to inform the insured of National's final compromise offer; (d) failing to give adequate consideration to the interests of the insured; and (e) recognizing the advisability of settlement, attempting to get the insured to contribute thereto. In determining whether National was negligent or guilty of bad faith in any of these particulars, it is necessary to refer in some detail (1) to the settlement negotiations in advance of trial; (2) Lucas' communications with the insured and company relating to the policy limits; and (3) the conversations immediately prior to and during trial between Lucas and (a) the insured, (b) Hoth, and (c) plaintiff's counsel.

Lucas was employed by National within a month after the accident. On March 30, 1955, he wrote Jessen offering to pay medical bills plus $200.00. On April 13, Jessen rejected the offer and indicated that he might take about $5,000.00 or $6,000.00. On June 6, Lucas, on behalf of National, wrote Jessen offering $740.00, which was rejected by Jessen on June 13, 1955.

On July 11, 1955, Lucas reported to National that plaintiff had retained an attorney who submitted an oral demand of $5,000.00, and that he had told the attorney National would reject the offer. In letter to Lucas dated July 13, 1955, National took the position that Jessen was contributorily negligent and informed Lucas that the $5,000.00 offer should be rejected and counsel advised that the $740.00 offer would be withdrawn unless accepted within ten days.

Suit was instituted on April 5, 1956, for $70,796.00. In a letter dated April 3, 1956, National suggested that Lucas "write an excess letter to our insured advising him that his limits are only in the amount of $10,000 and that he had the alternative of choosing an attorney of his choice to represent him or work with you in this matter".

On April 27, 1956, Lucas wrote the insured:

"You will recall that the limit of your coverage in the case brought by Mr. Jessen is $10,000, whereas the suit claims damages in the sum of $71,161.00 or in the amount of $61,161.00 in excess of your insurance coverage. I called this to your attention orally the other day and you advised that you desire me to represent you on all facets of the case, as well as acting as the attorney for the insurance company.

"No written notice has been given to you however, and at the request of the insuring carrier I am calling to your attention that if a judgment should be rendered in excess of $10,000, you will be liable for that excess amount. To that end you are entitled to hire your own counsel at your own expense to protect your interest in the case, and it is my understanding that you so desired me to represent you.

"Please advise if the situation is otherwise."

---

1. It is unnecessary to review in detail the evidence on this first contention, in view of my conclusion that National was chargeable with bad faith in other particulars.

On January 29, 1957, Lucas wrote National's Montana representative: "I am sorry about the delay in forwarding you the copy of the letter you requested. On April 27, 1956, I forwarded an excess letter to Mr. O'Daniel advising him that his insurance coverage was only $10,000.00, a copy of this letter being inclosed. Prior to that time Mr. O'Daniel had conferred with me about the case and asked me to handle his end also, but I, nevertheless, wrote him the inclosed letter and he came in and confirmed the original arrangements. If there is anything further to be done in connection with this feature of the case please advise."

O'Daniel paid Lucas a fee of $500.00 for his services.

In a letter to National dated May 17, 1956, Lucas recommended a settlement "in the neighborhood of $2,500".[2] On September 27, 1956, Lucas wrote National that the least plaintiff's counsel would accept was $9,000.00 and that the case was difficult to evaluate. He set forth the strong and weak points in the case. He expressed the opinion that "beyond any question, there is contributory negligence on the part of Mr. Jessen in this matter". On the other hand, he called attention to the fact that both O'Daniels were poor witnesses and that the case would be tried in Jessen's home county. He suggested an offer of $5,000.00, stating: "Frankly, I dislike making an overture of settlement in a situation of this type, where we apparently have a good defense, but feel we are on dangerous ground because of the facts heretofore given." National wrote Lucas on October 8, 1956, that, if the settlement proposal did not drop below $5,000.00, they would have to try the case.

On April 4, 1957, Lucas wrote National in pertinent part: "The last offer of settlement was in the form of a demand from opposing counsel for $9,000.00. I have made them the top offer of $5,000.00 which you authorized, and they have rejected it. This is a case in which we have a good defense but which, nevertheless, is dangerous in that it does involve a local person before a local jury. However, I feel that the $5,000.00 offer is adequate and unless your company feels that a further offer is warranted I will prepare for trial and consider the case as one that cannot be reasonably settled."

O'Daniel's deposition was taken on September 21, 1957. In transmitting a copy to National on September 25, Lucas said that O'Daniel was "very excitable and makes an extremely poor witness"; that his recollection was somewhat faulty; that Jessen was deputy sheriff of Garfield County and well thought of in that area; that these features "combined with the small town sentiment * * * makes the situation potentially a dangerous one". On September 27, Lucas reported on Jessen's deposition, stating that it was "apparent that Jessen is going to be a very good witness" and that if the jury believed his story, "we are in serious trouble".

Lucas wrote National on October 5, 1957, enclosing copies of most of the instructions he intended to offer at the trial, reviewing some of the factors mentioned in prior letters, and concluding, "I am inclined to believe we would do well to go higher on our settlement offer and will probably phone you before the weekend is over. The last offer for settlement was $9,000 and opposing counsel tell me that in view of the jury panel and other conditions they could not advise their client to settle for any less".

The trial began on Tuesday, October 8, 1957. Howard O'Daniel, insured's son, testified that on Sunday, October 6, in a

---

2. This letter reads in pertinent part: " * * * As indicated at the very beginning, I feel O'Daniels have been good defense for contributory negligence. However, Mr. O'Daniel and his son, who was a passenger, are going to be mighty poor witnesses, and unless something new should develop, I am going to recommend settlement in the neighborhood of $2,500. I will confirm this in my letter after the visit to Jordan, and if I do make such a final recommendation, I am sure it will only be in view of the fact that I have a difficult witness to work with * * *."

conference in Miles City at which the insured, Howard, Howard's brother, and Lucas were present, they went over the facts of the case; that at the close of the conference Lucas informed them the case could be settled for $9,000.00 and the insurance company would pay $5,000.00; that the insured said he would contribute $1,000.00 toward a settlement; that after Lucas indicated a jury verdict might go as high as $18,000.00, the insured said he would contribute $2,000.00; that Lucas said he would call the insurance company and tell them O'Daniel would go the $2,000.00, and that if the insurance company would go the other $2,000.00, they would not have to go to trial.

O'Daniel testified further that the "trial went on Wednesday and it was beginning to look pretty bad;" that he and his father went to Lucas' room early Thursday morning; that his father asked Lucas whether he had told the insurance company that he (O'Daniel) would pay $2,000.00, and Lucas replied that he had but the company would not "budge"; that on Friday morning the case was looking still worse, and Lucas said he was going to call the insurance company and suggest that they settle; that there was a rather long recess, and thereafter the insured asked Lucas what they said, and Lucas replied "that they wouldn't do a thing"; that Lucas said further, "You are only insured for $10,000.00, and they can settle for $9,-000.00. It was the impression we could just as well gamble the other $1,000.00."

According to Lucas, his first conference with the insured regarding contribution was Friday morning, October 11, when O'Daniel said something to the effect, "I will kick in or pay $1,000.00 or $2,000.00 to get rid of this or to get it settled or help get it settled, or some-thing along those lines"; that he "rather indicated to me he would go to $2,000.-00" to settle; that there may have been other conversations, but if so, Lucas believed they occurred after this time.

It was Lucas' recollection also that the first time O'Daniel offered to contribute $2,000.00 was after Lucas talked with Hoth on Friday morning.[3] Lucas did not communicate O'Daniel's offer to National at any time.

We turn now to the conversations between Lucas and Hoth:

Lucas testified that he talked with Hoth on Tuesday, October 8; Thursday, October 10; and Friday, October 11; and possibly also on the 9th. On the 8th, Lucas reported on the impanelment of the jury, calling attention to the various unfavorable factors mentioned in prior letters and expressing the opinion that the case was "potentially dangerous". He testified that Hoth advised him that they felt "we have a valid defense of contributory negligence particularly as a matter of law" and authorized Lucas to go as high as $5,000.00. On Thursday, Lucas reported to Hoth that the trial "was going bad", that the two O'Daniels had been impeached, that there was a difference in the highway patrolmen's testimony, and he recommended "serious consideration be given to the settlement of $9,000.00". He also advised Hoth that "O'Daniel had been alerted and wanted the case settled and had insisted I call an attorney in his behalf, and I have called an attorney in Forsyth right after trial and had been unable to reach him and had called Clayton Jones in Miles City, stating O'Daniels had asked me to call in his behalf, and after asking me a few additional questions he stated in effect, 'I demand you settle within the policy limits.' "[4] Hoth

3. Lucas testified: "It is my recollection that when I came back from making the call and advised him (O'Daniel) the way it stood there was no possibility of settlement at the figure of $9,000.00, and I had wrangled a top of $6,500.00, and that was the absolute top, that Mr. O'Daniel made his statement to me, 'I will kick in

$1,000.00 or $2,000.00', or words to that effect."

4. This was corroborated substantially by Jones in a deposition. Jones testified that he did not know O'Daniel prior to Lucas' call, knew nothing about the case except what he learned from Lucas in

again said he viewed the defense sound on the defense of contributory negligence as a matter of law and wanted Lucas to continue with the trial.

With respect to the conversation on Friday, October 11, Lucas testified that he recited again the reasons he felt the case was bad, "and we could expect an excess verdict of $20,000.00 or more", and referred again to the attorney's telephone conversation from the previous evening where they had demanded we settle within the policy limits". He said that finally Hoth indicated they would raise the offer "to $6,500.00 and that was the absolute top, and because of the strength of his conviction of the ability on our defense to succeed, plus the very strong way he indicated they would not go anything over $6,500.00, I felt it was useless to communicate the additional offer of O'Daniels, and did not communicate it". (Tr. p. 50) Lucas testified further that he "urged them to settle the case for $9,000.00, and Mr. O'Daniel asked me to place the call and discuss it once again". (Tr. p. 61)

Hoth testified that on either October 8 or 9 he confirmed Lucas' authority to offer $5,000.00; that on Thursday, October 10, Lucas asked for authority to settle for $9,000.00; that he thought Lucas estimated that the verdict could go over $20,000.00 on an injury basis; that in one of the conversations he authorized Lucas to increase the offer to $6,500.00; that he made it clear that "$6,500.00 was what we regarded as the absolute top we could go in the case"; that he considered Lucas a "competent attorney to evaluate the worth of a case as it went through the trial". Hoth testified further that when informed by Lucas of Clayton Jones' request he replied that "this was a heck of a time to change horses in mid-trial or in midstream; if the policyholder really felt this way he ought to go and buy out his interest himself, we would let him negotiate out his excess exposure, if any, directly with the plaintiff's attorney". (Tr. p. 180)

Hoth did not hear of the offer of contribution made by O'Daniel until long after the trial, when he got the information from "(A) quotation from a letter that Mr. Lucas sent to us, allegedly quoting some other attorney, referring to this demand, and that they were going to hold the insurance company liable, or try to." Had Hoth known of the offer of contribution he would probably have settled the case.[5]

Lucas could not state positively whether he communicated the $6,500.00 offer to plaintiff's counsel following his conversation with Hoth on Friday, October 11;[6] nor did he recall whether he ever made an offer of $8,500.00, i. e., $6,500.00 plus the $2,000.00 O'Daniel was willing to contribute.[7]

---

that call, and received no fee for his services; that he agreed with Lucas to act as O'Daniel's attorney; that after an extended discussion regarding the facts, progress of the trial, and probable verdict, "I * * * demanded to Mr. Lucas, as attorney for the insurance company, that he settle the case within the policy limits if he possibly could, and told him that unless this were done and every effort made to settle within the limits, that O'Daniel would hold or attempt to hold the insurance company responsible for the amount of any verdict in excess of $10,000.00." (Dep. p. 13)

5. Hoth testified:
"Q. Under the circumstances as they then existed, had you known about it would you have settled the case?
"A. Yes, probably I would have either had to yield, or try to split the difference

or something. If the man indicated his good faith demand we settle within the policy limits, backed by money, I am afraid I would have to go against my better judgment and settle it." (Tr. p. 181)

6. When questioned by Mr. Colgrove as to whether the $6,500.00 offer had been communicated to him, Lucas testified in part: "Well, I am quite certain that I did. * * * I am positive only I came back and told you we could not do business at the $9,000.00 figure or anything close to it. Whether I told you they had come up to the $6,500.00 figure or not, I can't be positive." (Tr. p. 76)

7. On cross-examination Lucas testified:
"Q. The other question is whether or not you ever made an offer to Mr. Col-

Colgrove testified that prior to trial Lucas had offered $5,000.00 in settlement; that this offer was never raised; that following Lucas' telephone conversation with Hoth on Friday morning, Lucas talked with him "and asked what the situation was, and he stated to me that the company had told him that—this is in substance—the company had told him that they would not settle for nine, they might just as well go ahead because they only had one to lose anyway, and I am talking of thousand dollars"; that he overheard a conversation that morning between Lucas and O'Daniel in which there was a reference to a $2,000.00 contribution. On cross-examination Colgrove testified that the offer of $5,000.00 was made back in April, 1957, and that Lucas did not communicate any further offer at any time, and in particular did not add to the $5,000.00 "the contribution offer of Mr. O'Daniel".

On Saturday, October 12, Lucas wrote Hoth, reporting on the status of the case. (Ex. 9) That letter, however, was not received by Mr. Hoth until Monday, October 14, the day the jury's verdict was returned. The letter in large measure confirmed prior telephone conversations between Lucas and Hoth [8] and was received in evidence for that purpose. The court reserved a ruling on the question of whether the contents of the letter would be binding upon National by reason of Lucas' agency.

I find from the evidence, and apparently the parties agree, that:

1. Lucas did not at any time communicate to plaintiff's attorney an offer of $8,500.00, i. e., $6,500.00 from National and $2,000.00 as a contribution from O'Daniel.

2. Lucas did not at any time communicate to O'Daniel the top offer of $6,500.00 authorized by National.

3. National did not at any time know of O'Daniel's offer of contribution.

4. Had Lucas communicated the respective offers to the other parties, the case would probably have been settled.

It is undisputed that in the conversations between Lucas and Hoth during the trial, Lucas expressed the opinion that the jury verdict might exceed $20,000.00 and recommended that National go to $9,000.00, if necessary, to settle the case. It is clear that Hoth at all times took the position that Jessen was guilty of contributory negligence as a matter of law.[9]

In the early correspondence Lucas shared National's opinion that the insured had a valid defense of contributory negligence as a "matter of law". It is not clear whether National contends that Lucas was of the same opinion at the time of trial.[10] Hoth testified that Lucas

grove or any person representing Mr. Jessen of $8,500.00, this $6,500.00 plus $2,000.00 which Mr. O'Daniel was willing to contribute?

"A. Again I don't recall, except to tell Mr. Colgrove we could not do business at the $9,000.00 figure." (Tr. p. 78)

8. This letter reads in pertinent part:

"* * * * As I have advised you repeatedly I feel that this case is an extremely dangerous one and anticipate an adverse judgment that could exceed $20,-000.00. As you are aware this is an intersection case and the right of way law in effect in Montana at the time of the accident in 1954, was simply that the first car into the intersection had the right of way.

"Plaintiff has put in a good sound case and as indicated to you over the phone we were surprised by the testimony of the Highway patrolman. * * *" (Ex. 9)

9. Hoth testified:

"Q. Mr. Hoth, you have testified as to certain specific items and generally the documents you had in order to reach a conclusion. Now will you tell the court just what your conclusion was as to the disposition of this case?

"A. My conclusion was that the plaintiff was guilty of contributory negligence as a matter of law as to look out. That is the way I felt about it. I cannot think of any way our man could have reached that intersection at any credible speed without being in the view of Mr. Jessen at a distance of 60 feet from the intersection." (Tr. p. 168, 169)

10. An opinion that the defense of contributory negligence is good as a matter

did not at any time in their conversations during the trial "mention any item" that changed the situation with regard to contributory negligence and that Lucas stated they should win on that defense.[11]

Lucas had written National on September 25, 1957: "My analysis is that this is a clear cut case of contributory negligence on the part of both parties, as I am inclined to believe that O'Daniel was driving just a little too fast and as he came up over the blind hill immediately before the accident he did not exercise the caution he should have." In his letter of October 5, 1957, Lucas said: "We have a fairly sound defense in our contributory negligence feature if it goes in intact, but I am very apprehensive."

At the trial Lucas testified that in his "earlier analysis of the case, before thoroughly briefing it", he reported to the company "that the right of way laws and statutes of Montana required that the driver approaching from the left must yield to the driver approaching from the right"; but that "at least two months prior to trial I ascertained that was not the law of Montana, and we decided to leave the complaint in the same manner it was and offer an instruction at the time. It later became the law of Montana". (Tr. p. 43, 44) He testified that this information was related to the Montana representative of National, to whom he reported at all times prior to the week before trial. Lucas believed he also "discussed this right of way proposition with Mr. Hoth" in one or two telephone conversations shortly before the trial.[12]

I find from the evidence that prior to the trial Lucas had changed his opinion that the defendant should prevail "as a matter of law" on the defense of contributory negligence and had so advised National. He was still of the opinion that it was a "fairly sound defense" if defendant's evidence went in intact, but he was "very apprehensive". I further find that during the course of the trial Lucas urged National to settle fo $9,000.00 and advised National that the jury verdict might exceed $20,000.00.

■■ Error in judgment in not settling a case within the policy limits is not in itself sufficient to impose liability upon the insurer for any recovery in excess of the limits; nor is the mere fact that the insurer was unsuccessful in the trial of the case sufficient to show that the defense was not made in good faith.[13] On the other hand, in determining whether a compromise offer of settlement

---

of law is quite different from a belief that the defendant's evidence will constitute a good factual defense, recognizing, however, that a jury issue is presented.

11. Hoth testified in pertinent part:
   "Q. During these discussions during the trial was there any—did Mr. Lucas mention any item that changed the situation with regard to contributory negligence?
   "A. No.
   "Q. Did he suggest that there was any change?
   "A. No
   *     *     *     *     *
   "Q. * * * What did Mr. Lucas say as to the defense of contributory negligence?
   "A. It was at all times prevalent in the case.
   "Q. Not only prevalent, what did he say?
   "A. That we should win." (Tr. p. 165, 166)

12. In response to a question as to whether he mentioned the Flynn case (Flynn v. Helena Cab & Bus Co., 1933, 94 Mont. 204, 21 P.2d 1105) to Hoth in these telephone conversations, Lucas testified:
   "A. I don't recall definitely. My impression is I may have mentioned it in the last conversation, but I can't state it for certain. May I correct that, Judge?
   "THE COURT: You may.
   "A. However, the basic right of way law in Montana, and the holding of the Flynn case was the subject of some discussion, but perhaps not the Flynn case in so many words."

13. Ballard v. Citizens Cas. Co. of New York, 7 Cir., 1952, 196 F.2d 96; Davy v. Public National Insurance Company, 1960, 181 Cal.App.2d 387, 5 Cal.Rptr. 488; Henke v. Iowa Home Mutual Casualty Company, 1959, 250 Iowa 1123, 97 N.W.2d 168.

should be accepted, the insurer must give the interests of its insured equal consideration with its own interests and must in all respects deal fairly with the insured. The applicable rule was well stated by Judge Phillips in American Fidelity & Casualty Co. v. G. A. Nichols Co., 10 Cir., 1949, 173 F.2d 830, 832:

"When a liability insurance company by the terms of its policy obtains from the insured a power, irrevocable during the continuance of its liability under the policy, to determine whether an offer of compromise of a claim shall be accepted or rejected, it creates a fiduciary relationship between it and the insured with the resulting duties that grow out of such a relationship. Under policies like those here involved, the insurer and the insured owe to each other the duty to exercise the utmost good faith. While the insurance company, in determining whether to accept or reject an offer of compromise, may properly give consideration to its own interests, it must, in good faith, give at least equal consideration to the interests of the insured and if it fails so to do it acts in bad faith."[14]

There is some conflict in the authorities as to whether the insurer's obligation is only to act in "good faith" to the insured, or whether it is required also to exercise "due care" and is liable for a negligent rejection of a compromise offer. An annotation in 40 A.L.R. 2d 168, 170, well summarizes this distinction and points out that while the cases may be conveniently arranged according to whether they purport to apply the "good faith" test or the "negligence test", with the great majority of the courts grouped under the former rule, "the resulting neatness is highly illusory", and in many recent cases the two tests "have tended to coalesce with many of the courts which have in terms rejected the 'negligence' test agreeing, nonetheless, that the insurer's negligence is a relevant consideration in determining whether or not it exercised the requisite good faith".[15]

There is no uniformity in the decisions with respect to what constitutes "bad faith". Each case must be decided on its own facts.[16] The elements of bad faith required to subject the insured to liability are generally proven by evidence largely circumstantial in nature. Factors to be considered include (1) whether, by reason of the severity of the plaintiff's injuries, any verdict is likely to be greatly in excess of the policy limits; (2) whether the facts in the case indicate

14. See also Ballard v. Citizens Cas. Co. of New York, supra; Tennessee Farmers Mutual Insurance Co. v. Wood, 6 Cir., 1960, 277 F.2d 21; Davy v. Public National Insurance Company, supra; Farmers Insurance Exchange v. Henderson, 1957, 82 Ariz. 335, 313 P.2d 404; Keeton, Ancillary Rights of the Insurer against his Liability Insurer, Vanderbilt Law Rev. Vol. 13, No. 4, reprinted 28 Ins. Counsel J. 395, 397 (1961), where the author suggests that combination of the requirements of good faith and equal consideration may be expressed as follows: "With respect to the decision whether to settle or try the case, the insurance company must in good faith view the situation as it would if there were no policy limit applicable to the claim."

15. See also Keeton, Ancillary Rights of the Insurer against his Liability Insurer, supra; Appleman, Circumstances Creating Excess Liability, Proceedings A.B.A.

Sec. of Insurance, Negligence and Compensation Law, 1960, 308, 313, where the author says in part: "Actually, in the enforcement of the principles, there is not too much difference except in lip service between the two rules. One who is a professional in the defense of lawsuits is held to a substantial duty, and the failure to observe that duty may constitute bad faith. That, in substance, is also the definition of negligence."

16. See Wymore, Safeguarding against Claims in Excess of Policy Limits, 28 Ins. Counsel J. 44 (1961), where the author suggests that, "Asking what constitutes negligence, bad faith, or lack of good faith is somewhat like asking what constitutes sin"; and that, "There are various shades or degrees of negligence or bad faith or lack of good faith that are followed by the various courts depending upon the facts of each case."

that a defendant's verdict on the issue of liability is doubtful;[17] (3) whether the company has given due regard to the recommendations of its trial counsel;[18] (4) whether the insured has been informed of all settlement demands and offers;[19] (5) whether the insured has demanded that the insurer settle within the policy limits; (6) whether the company has given due consideration to any offer of contribution made by the insured. As a rule no one factor is decisive. All must be considered in determining whether the insurer acted in good faith.

■ In applying these factors to the instant case, the first three are considered together. It is clear that National's counsel, at the time of trial, urged the acceptance of plaintiff's demand of $9,000.-00; that based on the injuries sustained by plaintiff, he would anticipate a verdict in excess of $20,000.00; and that he had concluded that the defense of contributory negligence was a question for the jury, and there was good reason to anticipate that the jury would find for the plaintiff. His reasons for these conclusions were explained fully to National's claims supervisor. Mr. Hoth, however, continued in his belief that the defendant should prevail as a matter of law on the defense of contributory negligence, and rejected the advice of his counsel. It is true, as counsel for National contend, that Mr. Hoth was an experienced claims examiner, regularly reviewing from 200 to 250 suit files, with ten new files a month coming to his attention, and a like number retiring. On the other hand, National regarded Mr. Lucas as a competent attorney to try and evaluate the case. Lucas was the sole representative of National at the trial and communicated daily with Hoth, reporting on all trial developments, as well as expressing his views regarding settlement.[20]

The settlement demands were properly reported to the insured, as was National's offer to pay $5,000.00. Lucas failed, however, to advise the insured of the authorization he had received from National to pay $6,500.00; nor did he apprise Hoth of the insured's offer to contribute $2,000.00 toward a settlement, or communicate to plaintiff's attorney any offer in excess of the $5,000.00 offer made some time prior to trial. Had Lucas made the proper disclosures to National, the insured, and plaintiff's counsel, there is good reason to believe that the case would have been settled.

17. With respect to the first two factors, Judge Kaufman, in Harris v. Standard Accident and Insurance Company, S.D. N.Y.1961, 191 F.Supp. 538, 540, rev'd on other grounds, 2 Cir., 1961, 297 F.2d 627, said: "It (bad faith) is most readily inferable when the severity of the plaintiff's injuries is such that any verdict against the insured is likely to be greatly in excess of the policy limits, and further when the facts in the case indicate that a defendant's verdict on the issue of liability is doubtful. (Citing cases.) When these two factors coincide, and the company still refuses to settle, the inference of bad faith is strong." I do not find in the instant case that these two factors alone are sufficient to constitute bad faith, but they are considered with the other factors.

18. See cases cited in Anno. 40 A.L.R.2d 168 at 212, § 14, holding that rejection of advice of insurer's own counsel may be evidence of bad faith, including Royal Transit v. Central Surety & Ins. Corp.,

7 Cir., 1948, 168 F.2d 345, cert. den. 335 U.S. 844, 69 S.Ct. 68, 93 L.Ed. 395. See also Henke v. Iowa Home Mutual Casualty Company, supra.

19. This factor has arisen most often in cases where the insurer did not disclose demands within the policy limits. See Anno. 40 A.L.R.2d 168 at 216, § 17. The rule is also applicable, however, where the insurer fails to disclose offers it has made. Davy v. Public National Insurance Company, supra; Henke v. Iowa Home Mutual Casualty Company, supra.

20. The insurer's failure to follow the advice of counsel, in itself and without more, is insufficient to sustain a finding of bad faith. Hawkeye-Security Ins. Co. v. Indemnity Ins. Co., 10 Cir., 1958, 260 F.2d 361, 69 A.L.R.2d 684. The persistent recommendation of counsel during the trial under the circumstances here, however, must be considered in determining the ultimate question of good faith.

It is clear also that the insured was under the impression that Lucas had reported to Mr. Hoth the offer of contribution. Lucas did advise Hoth on two occasions that the insured had demanded that the company settle within the policy limits and that if settlement were not made he would attempt to hold the company responsible for any excess recovery.[21]

Giving due consideration to all of the foregoing factors, it is my conclusion that cross-complainant has established bad faith on the part of National.

National contends further, (1) that the O'Daniel estate may not maintain this action since it has not suffered any loss through payment of the judgment, and plaintiff, as a judgment creditor, has no cause of action for any amount in excess of the policy limit; and (2) that since the insured also employed Lucas as his own counsel, (a) Lucas was subject to the insured's direction and control for any excess claim, and (b) in view of the fact that settlement was prevented by failure of full disclosure by a mutual attorney, the insured may not recover against the insurer.

It is undisputed that no payment has been made by either O'Daniel or his estate. It is assumed for the purpose of this opinion that the assets of the estate are insufficient to pay the excess judgment in full.[22]

Some courts have held that payment by the insured is a condition precedent to his cause of action against the insurer.[23] Others have held that the cause of action arises when the insured incurs a binding judgment in excess of the policy limit.[24] There is likewise a split in the authorities on whether the insured is damaged by an uncollectible judgment against him.

Both questions were considered by the Fourth Circuit in Lee v. Nationwide Mutual Insurance Company, 1961, 286 F. 2d 295, where, as here, the action against the insurer was prosecuted by the representative of the insured's estate. There, as here, the assets of the estate were insufficient to pay the excess judgment in full. The judgment in that case, however, had been rendered against the administratrix of the insured's estate. The lower court[25] had held that since the estate had suffered no pecuniary damage

21. The mere fact that the insurer fails to settle within the policy limits following a demand by the insured is not in itself evidence of bad faith. Often a demand is made by the insured as a routine matter. Under the circumstances here, however, the demand by the insured is entitled to weight, to be considered with the other factors in determining whether National exercised the requisite good faith.

22. It is alleged in National's answer that the total value of the property which O'Daniel owned at the time of his death and which would be subject to the judgment is $11,846.05, that probate costs will amount to approximately $1,400.00, leaving a net estate of $10,446.05, "and that by reason thereof the liability, if any, of this cross-defendant is limited to $10,446.05". It was agreed at the pretrial conference that if the court should rule with National on this contention, the amount of the net value of the estate would be determined in a separate proceeding.

23. Dumas v. Hartford Accident & Indemnity Co., 1942, 92 N.H. 140, 26 A.2d 361;

Universal Auto. Ins. Co. v. Culberson, 1935, 126 Tex. 282, 86 S.W.2d 727, 87 S.W.2d 475; Norwood v. Travelers Ins. Co., 1939, 204 Minn. 595, 284 N.W. 785, 786, 131 A.L.R. 1496; cf. American Mutual Liability Ins. Co. of Boston, Mass. v. Cooper, 5 Cir., 1932, 61 F.2d 446, cert. den. 289 U.S. 736, 53 S.Ct. 595, 77 L. Ed. 1483 (1933); Boling v. New Amsterdam Casualty Co., 1935, 173 Okl. 160, 46 P.2d 916. (Both of these cases involved question of when statute of limitations began to run.)

24. Brown v. Guarantee Ins. Co., 1958, 155 Cal.App.2d 679, 319 P.2d 69, 66 A.L.R. 2d 1202; Henke v. Iowa Home Mutual Casualty Company, supra; Farmers Ins. Exchange v. Henderson, supra; Southern Fire & Cas. Co. v. Norris, 1952, 35 Tenn. App. 657, 250 S.W.2d 785, cert. den. by Tennessee Sup.Ct., 1952; Schwartz v. Norwich Union Indemnity Co., 1933, 212 Wis. 593, 595, 250 N.W. 446; Murray v. Mossman, 1960, 56 Wash.2d 909, 355 P.2d 985.

25. The opinion of the district court, D.C. Md.1960, 184 F.Supp. 634, contains an

it had no cause of action. While recognizing that "both principle and precedent * * * can be advanced for this view", the appellate court, in reversing, said in part:

"Had the insured survived, even insolvent, the outstanding judgments, as constant and life-long threats to his financial security and rating, would have caused him almost immeasurable · damage. Certainly it would have rounded out his cause of action against the insurer for tort. Logically, his death ought not to relieve the insurer's situation —it ought not to be a boon to the insurer—just as it should not aggravate it. * * *

"The damage done to the estate is the creation of its liability for the judgments. Their holders are creditors equally with other persons with whom debts may have been incurred though not paid, such as medical and hospital expenses. The tort origin of the judgments does not change their character as estate debts. They are nonetheless damages though they represent no contribution to the insured or his estate. The rule of damages, nearly universal, that incurrence is equivalent to outlay, is not restricted to any particular category of obligation."[26] (286 F.2d at 295, 296)

The court also adopted "the summary of the law on this point" as set forth by Justice Whittaker, then district judge in Wessing v. American Indemnity Co., W.D.Mo.1955, 127 F.Supp. 775, 781: " * * * It would be the clearest kind of error for a Missouri court to instruct a jury that they could not consider the element of damage consisting of medical, nursing and hospital expenses which had been *incurred* by the plaintiff but not *paid*. I think the analogy between that element of damage in a bodily injury suit, on the one hand, and the element of damage to the plaintiffs here, through suffering or 'incurring' this judgment, on the other hand, is so close as to be indistinguishable, and, I think, too, that payment is no more a condition precedent to suit for recovery of the damage in the one case than in the other."[27]

National relies strongly on Harris v. Standard Accident and Insurance Company, 2 Cir., 1961, 297 F.2d 627. It is true that this decision lends support to National's position. On the other hand, it is factually distinguishable in that the insured in that case had been discharged in bankruptcy from the liability of the excess judgment. The majority opinion by Judge Lumbard clearly recognizes the

---

exhaustive and impartial review of the authorities. Judge Watkins recognizes that, "The trend of the recent decisions has generally, although not uniformly, been to allow recovery in a suit by an insured plaintiff based merely upon entry of a judgment, after breach of the insurer's duty of settlement, against plaintiff in excess of the policy limits, regardless of whether the insured has paid or can pay any or all of the judgment above the amounts of the policy limits." (184 F.Supp. at 639, 640)

26. The court considered the effect of a prior decision of the same circuit, State Automobile Mut. Ins. Co. of Columbus, Ohio v. York, 4 Cir. 1939, 104 F.2d 730, 734, relied upon by National and cited frequently in support of the view that the judgment must be paid before a cause of action arises against the insurer. It was not so interpreted in Lee v. Nationwide, the court saying: "Judge Parker there wrote that the evidence established neither negligence nor bad faith in the insurer's refusal to make a settlement. The fact was that the insured never had a case in tort against the insurer for the surplus of the injured party's judgment. Judge Parker's remark that the insured had not been damaged 'as he had not paid the judgment against him and testified that he never expected to pay it', was merely a comment upon the hollowness of the suit."

27. The California court in Brown v. Guarantee Insurance Company, supra, also relies upon the Wessing case, holding that it "applies equally in California since it has long been established in our state that a plaintiff may recover for medical expenses which he has incurred but not yet paid." 319 P.2d at 76. The same is true in Montana. See Hoenstine v. Rose, 1957, 131 Mont. 557, 312 P.2d 514.

split in the authorities on the question of whether the insured is damaged by an uncollectible excess judgment against him, and expressly distinguishes Lee v. Nationwide Mutual Ins. Co., supra, and other cases where there was no evidence that the insured was insolvent before the excess judgment was rendered.[28]

National also relies upon cases holding that the judgment creditor may not sue the insurer for the excess judgment, including Chittick v. State Farm Mutual Automobile Ins. Co., D.Del.1958, 170 F.Supp. 276. At the outset of the opinion in that case the court calls attention to the fact that the insured was not "a party to this proceeding and his rights, if any, cannot now be determined or concluded". The judgment creditor sought recovery on a theory akin to subrogation. In holding that he had no right of action, the court expressly recognized the distinction between an action by a judgment creditor and one by the insured. The court referred to the case of Wessing v. American Indemnity Co., supra, which was a consolidation of two cases, one by the insured and the other by the injured person who was a judgment creditor of the insured. Both actions sought recovery in tort from the insurer based upon its bad faith in failing to settle within the policy limits. Judge Whittaker granted a motion to dismiss the action instituted by the injured person and judgment creditor, but denied the motion to dismiss the action by the insured.

I agree with National that the plaintiff Jessen has no cause of action against National, but this action is prosecuted by the insured's estate against National as a third party defendant in an action instituted by Jessen against the estate. I do not agree that "if the company is defeated in this case the only party who will gain is the plaintiff." It is true that any judgment recovered by the estate would be used in satisfaction of the Jessen judgment. On the other hand, if recovery is denied, the net estate would be subject to the Jessen judgment and presumably would have to be liquidated and the proceeds applied in partial satisfaction of the judgment.[29]

■ Recognizing that there is substantial authority to the contrary, I have concluded to follow what appears to be the trend of the recent cases, i. e., that the insured's cause of action arose upon the entry of the Jessen judgment and that it was not necessary that the insured or his estate pay the judgment before instituting this action.[30]

It is National's final contention that Lucas was acting as a mutual attorney or agent for both National and O'Daniel, and accordingly "neither party can be held accountable for knowledge that the mutual attorney had, but did not transfer to the other parties or to either of them".

As noted supra, Lucas was employed by National in November, 1954, within a month after the accident. Suit was in-

28. The court said in part: "Those cases which apparently hold that the rendition of an excess judgment is sufficient damage to permit a recovery for the amount of the unpaid judgment are all distinguishable. * * * In several * * * cases heavily relied upon by the trustee, the courts were dealing with estates which were solvent before the excess judgments were rendered. In none of the other cases permitting recovery of the amount of the excess judgment without payment was there any evidence that the insured had been discharged from the liability, and in only two cases was there even a hint that the insured was insolvent prior to the excess judgment." (297 F.2d 632, 633.)

29. Lee v. Nationwide and Henke v. Iowa Home Mutual Casualty Company, supra, held contrary to National's contention. In both of those cases the ratio of the net estate to the judgment was substantially less than here.

30. In particular, see Lee v. Nationwide Mutual Insurance Company, supra, 1961; Henke v. Iowa Home Mutual Casualty Company, supra, 1959; Murray v. Mossman, supra, 1960; Brown v. Guarantee Ins. Co., supra, 1958. Contra is Harris v. Standard Accident and Insurance Company, 1961, which, as noted supra, is factually distinguishable.

stituted April 5, 1956. Pursuant to National's request, Lucas wrote the insured on April 27, 1956, calling attention to the policy limits and that O'Daniel would be liable for any excess, and stating, "To that end you are entitled to hire your own counsel at your own expense to protect your interests in the case, and it is my understanding that you so desired me to represent you." A copy of that letter was sent to National on January 29, 1957, in which Lucas informed the company that prior to writing O'Daniel, the latter "had conferred with me about the case and asked me to handle his end also", and that following receipt of the letter O'Daniel "came in and confirmed the original arrangement".

It is of course a common, if not routine, practice for an insurance company to write an "excess letter" to the insured where the demand exceeds the policy limit. In most cases the insured relies upon the attorney selected by the insurer to represent him in the litigation. In some instances, where the insured fears an excess recovery, he will retain an additional counsel to protect his interests. Here, however, we have the unique situation of the insured paying a fee to the attorney selected by the insurer, to do what in effect the attorney was already required to do under his contract of employment by the insurance company.[31] It is not surprising that neither counsel nor the court has found any case precisely in point on this factual situation.

Lucas was employed by National pursuant to the contract of insurance granting National the right, and imposing the correlative duty to defend suits against O'Daniel and to "make such investigation, negotiation, and settlement of any claim or suit as it deems expedient", and imposing upon O'Daniel the duty to cooperate with the company in both settlement negotiations and conduct of the trial. There is some conflict in the authorities as to whether the insurance carrier becomes an agent of the insured with respect to settlement and trial,[32] or is in the nature of an independent contractor. The precise relationship is unimportant. The authorities agree that these provisions of the contract have the effect of placing absolute and exclusive control over the litigation in the insurance carrier, with "the correlative duty to exercise diligence, intelligence, good faith, honest and conscientious fidelity to the common interests of the parties".[33]

This situation is clearly distinguishable from those cases where two parties dealing at arms length employ the same attorney or agent, with the consent of both. Ordinarily in those cases neither party is liable to the other for the tortious acts of the agent, absent participation therein;[34] although it has been held that each principal is charged with notice of that which becomes known to the agent during the negotiations.[35] Under an insurance contract, however, the insurer initially employs the attorney to represent the interests of *both* the in-

---

31. Both National and Lucas, its attorney and agent, were obligated to provide the insured with the same defense regardless of the amount demanded in the complaint.

32. It appears from Selby v. Victoria Mines, Inc., 1950, 124 Mont. 321, 221 P.2d 423, and the cases there cited with approval, that the Montana court takes the position that the insurer is in effect the agent of the insured in settlement negotiations and trial.

33. Traders & General Ins. Co. v. Rudco Oil & Gas Co., 10 Cir., 1942, 129 F.2d 621, 627, 142 A.L.R. 799, 806. The court said further: "When the insurer undertakes the defense of the claim or suit, it acts as the agent of its assured in virtue of the contract of insurance between the parties, and when a conflict of interest arises between the insurer, as agent, and assured, as principal, the insurer's conduct will be subject to closer scrutiny than that of the ordinary agent, because of his adverse interest." See also cases cited in note 14.

34. 3 C.J.S. Agency § 260, p. 194; Bunn v. Bunn, 1933, 137 Kan. 933, 22 P.2d 455; Ringer v. Wilkin, 1919, 32 Idaho 330, 183 P. 986, 989.

35. See Ringer v. Wilkins, supra, and cases there cited.

sured and insurer. Usually their interests are the same. Even where a conflict arises, the insurer and insured are not merely adverse principals engaged in a transaction or negotiation in which together they have employed a mutual agent.[36] When a conflict does arise, it is the duty of the attorney to so advise both parties, and, if necessary, terminate his relationship with the insured.[37]

Lucas was employed by National to represent the interests of both O'Daniel and National. There was no conflict in those interests until Lucas discussed the settlement proposal with O'Daniel (either on October 6, 1957, as Harold O'Daniel testified, or later in the same week, as recalled by Lucas). At that point a possible conflict with respect to settlement became apparent. This conflict was partially recognized by Lucas, when he arranged with another attorney to represent O'Daniel in submitting a demand to National, through Lucas, that National settle within the policy limits. Certainly all parties—O'Daniel, Lucas, and National (through Hoth) recognized that in communicating this demand Lucas was representing National and not O'Daniel.

Particularly in view of this fact, it is reasonable to assume that all of the parties regarded Lucas as the agent of National in any subsequent settlement negotiations. This assumption is consistent with Lucas' testimony that O'Daniel "rather indicated to me he would go to $2,000.00 to settle", and "Mr. O'Daniel

made his statement to me, 'I will kick in $1,000.00 or $2,000.00' or words to that effect". It does not appear from this testimony that O'Daniel was asking Lucas as his own agent to transmit the offer of contribution to National, but rather was telling Lucas, as National's agent, what he would do to bring about a settlement.

Nor does it appear from the testimony of either O'Daniel or Lucas that Lucas was urging or advising contribution on the part of O'Daniel. He did apprise O'Daniel of the possibility of a verdict in excess of the policy limits. That was his duty irrespective of any special arrangement to represent O'Daniel.

There can be no question that in the absence of the special fee arrangement with O'Daniel, Lucas' conduct and knowledge would be imputed to National.[38] Under the circumstances here, the special arrangement cannot relieve National from its responsibility for Lucas' conduct in failing to disclose the various offers to the respective parties.

Cross-complainant expressly relies upon the insured's offer to contribute $2,000.00 toward the settlement. Under all the circumstances, I have concluded that this amount should be deducted from the recovery in this action.

Pursuant to Rule 11(b) of the Local Rules of Court, cross-complainant will prepare, serve and lodge proposed findings of fact, conclusions of law and judgment.

36. See Anno. 40 A.L.R.2d 168, 172, where the author recognizes the uselessness of trying to solve problems arising from automobile insurance contracts "by a legalistic construction of the insurance policy as a contract freely arrived at by negotiators acting voluntarily from positions of equal strength".

37. As stated supra, there are no cases precisely in point. Cases which have recognized the duty of the attorney to terminate his relationship when a conflict arises include Hammett v. McIntyre, 1952, 114 Cal.App. 2d 148, 249 P.2d 885, 888; Pennix v. Winton, 1944, 61 Cal.App.2d 761, 143 P.2d 940, 946, 145 P.2d 561.

38. See, for example, Waters v. American Casualty Co. of Reading, Pa., 1954, 261 Ala. 252, 73 So.2d 524; and Attleboro Mfg. Co. v. Frankfort Marine, etc., Ins. Co., 1 Cir., 1917, 240 F. 573.