**NATIONAL FARMERS UNION PROPERTY & CASUALTY COMPANY, a corporation, Appellant and cross-appellee,**

v.

**Howard O'DANIEL, Administrator with the Will Annexed of the Estate of John T. O'Daniel, Deceased, Appellee and cross-appellant.**

**No. 18487.**

United States Court of Appeals
Ninth Circuit.
Feb. 27, 1964.

Wiggenhorn, Hutton, Schiltz & Sheehy, and John C. Sheehy, Billings, Mont., and White & Steele, and Lowell White, Denver, Colo., for appellant.

Colgrove & Brown, and Bruce M. Brown, Miles City, Mont., for appellee.

Before HAMLIN, BROWNING and DUNIWAY, Circuit Judges.

HAMLIN, Circuit Judge.

In a Montana state court Henry Jessen was awarded a judgment of $35,000 against John T. O'Daniel in a personal injury action for damages as a result of a collision between an automobile driven by Jessen and a truck driven by O'Daniel. O'Daniel had a public liability policy with National Farmers Union Property & Casualty Company,[1] appellant herein, covering this accident, but the policy only covered him up to the sum of $10,000. Jessen's judgment was affirmed by the Montana Supreme Court.[2] Thereafter, National paid Jessen the full amount of its $10,000 coverage on account of such judgment. O'Daniel died without having made any payment on said judgment. After filing a claim for the excess of said judgment over $10,000 against O'Daniel's estate, Jessen brought suit in Montana state court on the judgment against Howard O'Daniel, appellee herein and son of John T. O'Daniel, as administrator of the estate of his father.

Appellee answered and filed a cross-complaint against National for negligence and bad faith in failing to settle the personal injury suit within the policy limits. National, a Utah corporation having its principal place of business in Denver, Colorado, removed the action to the United States District Court for the District of Montana upon proper motion on grounds of diversity of citizenship.

---

1. Hereinafter referred to as "National."

2. Jessen v. O'Daniel, 136 Mont. 513, 349 P.2d 107 (1960).

The district court awarded Jessen $25,-000 on his complaint and appellee $23,000 on his cross-complaint, findings of fact and conclusions of law being filed on November 28, 1962.[3] Appellant appeals from the judgment on the cross-complaint, appellee from that portion of the decree which reduces the judgment against appellant from $25,000 to $23,-000. Jurisdiction of this court is based on 28 U.S.C. § 1291 (1958).

From the record and the findings of the district court, the following facts appear. The collision occurred on November 4, 1954. National retained James P. Lucas to represent both itself and O'Daniel in defense of any action arising out of the accident. The trial court found that "the policy of insurance between National and O'Daniel provided that the company could 'make such investigation, negotiation and settlement of any claim or suit as it deemed expedient', and imposed upon O'Daniel the duty to cooperate with the company in both settlement negotiations and conduct of the trial." The personal injury action filed by Jessen was for in excess of $70,000, and Lucas, at National's direction, wrote an excess letter to O'Daniel which is set forth in the margin.[4] From this letter and from a letter of January 19, 1957, from Lucas to National's Branch Claims Manager in Great Falls,[5] it is clear that National knew of the arrangement between O'Daniel and Lucas whereby Lucas was to represent O'Daniel on the amount in excess of the policy coverage. However, National made no objection to this arrangement.

Lucas had originally advised National and its assistant claims manager and suit examiner, Robert C. Hoth, that in his opinion Jessen was contributorily negligent as a matter of law because the law of Montana gave the right-of-way to the vehicle on the right, which in this case was O'Daniel's truck. This position was maintained by Hoth throughout the trial. Lucas, however, on learning that Montana law at the time of the accident gave the right-of-way to the first vehicle entering the intersection, decided that contributory negligence was a jury question—a view of the case adopted by the local trial court and later affirmed by the

---

3. An opinion of the court below which is explanatory of these findings and conclusions is reported as Jessen v. O'Daniel, 210 F.Supp. 317 (D.Mont.1962).

4. "April 27, 1956
"Dear Mr. O'Daniel:
 "You will recall that the limit of your coverage in the case brought by Mr. Jessen is $10,000, whereas the suit claims damages in the sum of $71,161.00 or in the amount of $61,161.00 in excess of your insurance coverage. I called this to your attention orally the other day and you advised that you desire me to represent you on all facets of the case, as well as acting as the attorney for the insurance company.
 "No written notice has been given to you however, and at the request of the insuring carrier I am calling to your attention that if a judgment should be rendered in excess of $10,000, you will be liable for that excess amount. To that end you are entitled to hire your own counsel at your own expense to protect your interest in the case, and it is my understanding that you so desired me to represent you.

"Please advise if the situation is otherwise.
 "Very truly yours,
 "LEAVITT & LUCAS
 "By
 "James P. Lucas"
5. "January 29, 1957
"Dear John:
 "I am sorry about the delay in forwarding you the copy of the letter you requested. On April 27, 1956, I forwarded an excess letter to Mr. O'Daniel advising him that his insurance coverage was only $10,000.00, a copy of this letter being inclosed. Prior to that time Mr. O'Daniel had conferred with me about the case and asked me to handle his end also, but I, nevertheless, wrote him the inclosed letter and he came in and confirmed the original arrangements.
 "If there is anything further to be done in connection with this feature of the case please advise.
 "Very truly yours,
 "LEAVITT & LUCAS
 "By James P. Lucas"
 (signature)

Supreme Court of Montana.[6] Lucas was of the opinion that, if defendant's evidence went in intact, contributory negligence should be a good defense before the jury; however, he was "very apprehensive." Before trial Lucas wrote various letters to National which contained, inter alia, statements that "this is a case in which we have a good defense but which is nevertheless dangerous in that it does involve a local person before a local jury"; that "O'Daniel [at his deposition] was very excitable and makes an extremely poor witness"; "that his recollection was somewhat faulty; that Jessen was deputy sheriff of Garfield County and well thought of in that area; that these features, combined with a small town sentiment * * * makes the situation potentially a dangerous one." After taking Jessen's deposition, Lucas reported that it was "apparent that Jessen is going to be a very good witness" and that if the jury believed his story "we are in serious trouble." For a considerable time before the trial, Jessen's settlement demand was $9,000 and National's highest offer was $5,000. The trial started on October 8, 1957. On October 6, the Sunday before the trial, Lucas talked to O'Daniel, told him the case could be settled for $9,000 and that National would pay $5,000. Lucas then said, "Would you be willing to kick in anything with the $5,000?" In this conversation O'Daniel said he would "go $2,000." Lucas told O'Daniel he would call National and "tell them you will go the $2,000."

During the trial Lucas talked several times on the telephone with Hoth and advised him that the trial was "going badly"; that "opposing counsel had blown Mr. O'Daniel and one of his sons out of the water by impeaching them on a collateral matter"; "that O'Daniel had changed his story about applying the brakes"; and "that an adverse judgment could exceed $20,000." Lucas urged Hoth to accept Jessen's settlement offer of $9,000, but Hoth first refused to set-tle for more than $5,000, although he later raised this figure to $6,500. This last figure was not mentioned by Lucas to either Jessen or O'Daniel at any time. Hoth was also advised during the trial that O'Daniel had been alerted as to the progress of the trial and was demanding a settlement and had insisted that Lucas call an attorney in his (O'Daniel's) behalf; Hoth was also advised by Lucas that Lucas had called an attorney, one Clayton Jones, on behalf of O'Daniel, had advised him of some of the facts of the case, and that Jones had demanded on behalf of O'Daniel that the case be settled within the policy limits. Jones had no further contact with the case or with O'Daniel and never received a fee for his services. Hoth remained adamant and refused to settle the case. O'Daniel's offer to make a contribution of $2,000 toward settlement was not communicated by Lucas to either Jessen or Hoth, nor did Lucas notify anyone that the sum of $8,500 ($6,500 from National and $2,000 from O'Daniel) was available as a settlement offer. Parenthetically, it should be noted that the contribution offer by O'Daniel was made to Lucas before Lucas called Clayton Jones on O'Daniel's behalf, but that Hoth's offer to settle for $6,500 was made after that call.

The specific findings to which National objects on this appeal are findings 19 and 20, which read as follows:

"19. The combination of the following acts and omissions, taken together, establish bad faith on the part of National and a failure to give the interests of the insured equal consideration with its own interest in failing to settle within the policy limits: (1) The insured's demand that National settle within the policy limits; (2) the failure to give due regard to the advice of its counsel, who was the sole representative of National at the trial, that (a) the question of liability would be submitted to the jury and counsel would anticipate a verdict in favor of the

6. Jessen v. O'Daniel, 136 Mont. 513, 349 P.2d 107 (1960).

plaintiff, (b) that the verdict might exceed $20,000.00, and (c) his recommendation that the case be settled for $9,000.00, the amount of plaintiff's demand; (3) the failure to give due consideration to the offer of contribution made by the insured to National's counsel; and (4) the failure of Lucas as National's attorney to (a) inform the insured of the last settlement offer authorized by National, and (b) to inform plaintiff or his counsel of the fact that the case could be settled for $8,500.00 by reason of National's offer of $6,500.00 and insured's offer to contribute $2,000.00.

"20. When the insured made an offer to contribute $2,000.00, both Lucas and the insured understood that this offer was made to Lucas as National's agent."

From these facts, the trial judge concluded: (1) That Lucas was at all times the attorney and agent of National, that his conduct and knowledge must be imputed to National, and that National therefore must be held responsible for his failing to disclose the various offers of the parties; (2) that National was guilty of bad faith and failure to give its insured's interest equal consideration in failing to settle within the policy limits; (3) that the $2,000 offer of contribution must be deducted from the $25,000 payable to Jessen by O'Daniel's estate to determine how much the estate had been injured by the failure to settle;

---

7. Pertinent portions of the policy provisions are set forth below:

"I COVERAGE A—Bodily Injury Liability

"To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages, including damages for care and loss of services, because of bodily injury, including death at any time resulting therefrom, sustained by any person or persons, caused by accident and arising out of the ownership, maintenance, or use of the automobile.

*	*	*	*	*

and (4) that O'Daniel's cause of action had arisen as soon as judgment was entered in favor of Jessen in the personal injury litigation in 1957.

 The issues presented by this appeal are: (1) Is the evidence sufficient to support a finding of bad faith on the part of National in failing to settle within the policy limits; (2) can Lucas's knowledge and conduct be imputed to National alone or must it also be imputed to O'Daniel so that the failure to settle can be attributed to O'Daniel's negligence equally with National's bad faith; (3) must the judgment be paid before damage can be shown to the estate; (4) can the amount of damage exceed the net value of the estate; and (5) is Jessen, rather than the O'Daniel estate, the real party in interest, thus precluding the action against National? We hold that all these issues must be determined adversely to National. The issue presented by the cross-appeal is whether the $2,000 offer of contribution by O'Daniel can be charged against his estate in determining the damage. This issue is determined adversely to appellee and cross-appellant.

The policy involved in this case is a typical automobile liability policy which provides that the company shall defend all actions against the insured, but gives it the right to investigate, negotiate, and settle any claim it deems expedient. The insured is required to cooperate with the company in all ways.[7] It has been held that a policy of this type places a fiduci-

---

"II DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS

"As respects the insurance afforded by the other terms of this policy under coverages A and B the company shall:

"(a) defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient * * *.

*	*	*	*	*

"CONDITIONS

"3. Limits of Liability—Coverage A

"The limit of bodily injury liability stated in the declarations as applicable to

ary duty on the insurance company to look after the interests of the insured as well as its own, thus requiring it to consider fairly the insured's liability for the excess when evaluating an offer of settlement within the policy limits. Failure to do so is bad faith and renders the company liable for its breach of fiduciary duty in the amount of any judgment over the policy limits.[8]

We think it clear that, if Lucas's knowledge and conduct are imputed to National under recognized agency principles, there is ample evidence to sustain the finding of bad faith on the part of National in failing to consider the interests of its insured, O'Daniel. It cannot be denied that Lucas was National's agent throughout the course of the trial. Thus National, through its agent Lucas, knew that a settlement offer of $8,500 could be made instead of the $5,000 previously offered, and knew that Jessen had offered to settle for a mere $500 more, and failed to notify either Jessen or O'Daniel of that fact. Such conduct, in the face of its own attorney's recommendation that a settlement be made in a case that was going badly, can only be ascribed to a lack of good faith.

National, however, contends that Lucas was also the agent of O'Daniel, that Lucas's conduct and knowledge therefore must also be imputed to O'Daniel, and that where one agent is acting for two principals with the knowledge and consent of both, neither is liable to the other for the acts of the agent. Counsel has cited us no case where this rule has ever been applied in a situation such as the present one where one of the principals selected the agent, had complete control over the agent, and owed a fiduciary duty to the other principal.[9] On the contrary, the Fifth Circuit held in Smoot v. State Farm Mut. Auto. Ins. Co.,[10] a case where the wording of the policy was substantially the same as the one here in issue, that those whom the insurance company selects to execute its promises, including attorneys, are its agents for whom it has the customary legal liability. The court also said that the fact that the company sent the insured an excess letter of the type sent in this case was not enough to absolve the company of its legal responsibilities, including full responsibility for the acts of its agents.

---

'each person' is the limit of the company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, including death at any time resulting therefrom, sustained by one person in any one accident * * *.

 * * * * *

"16. Assistance and Cooperation of the Insured—

Coverages A, B, C–1, C–2, D, and E

"The insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the accident."

**8.** "When a liability insurance company by the terms of its policy obtains from the insured a power, irrevocable during the continuance of its liability under the policy, to determine whether an offer of compromise of a claim shall be accepted or rejected, it creates a fiduciary relationship between it and the insured with the resulting duties that grow out of such a relationship. Under policies like those here involved, the insurer and the insured owe to each other the duty to exercise the utmost good faith. While the insurance company, in determining whether to accept or reject an offer of compromise, may properly give consideration to its own interests, it must, in good faith, give at least equal consideration to the interests of the insured and if it fails so to do it acts in bad faith." American Fidelity & Cas. Co. v. G. A. Nichols Co., 173 F.2d 830, 832 (10th Cir. 1949).

**9.** The only case cited, Ringer v. Wilkin, 32 Idaho 330, 183 P. 986 (1919), involved a situation where a real estate broker represented both parties to the transaction and the principals had equal control over the agent.

**10.** 299 F.2d 525, 531 (5th Cir. 1962).

One factor is present in this case which was not present in *Smoot*. O'Daniel made a separate "arrangement" with Lucas and after the trial paid him a fee of $500 for his services. We think this is immaterial, for the so-called "arrangement" was not a contract. It lacked the essential requisite of consideration. Since National was required by the terms of the policy to defend the action and look after O'Daniel's interests as well as its own, and since Lucas was hired under that contract to represent both National and O'Daniel, he was doing no more in representing O'Daniel than he was already required to do by his contract with National. As observed by the *Smoot* court,

> "The settlement, by the policy terms is, of course, left to the Insurer. * * * [L]ittle leeway is afforded to the so-called 'independent' counsel acting for the Assured's excess interests. What is he to do? If he settles, or encourages settlement by direct contact with the damage suit plaintiffs or the plaintiff's counsel, he invites a serious challenge that the Assured has declined to cooperate with the Insurer whose counsel is opposed to the idea of settlement. Or worse, he is exposed to the charge that he has connived with the enemy. If his purpose is merely to demand in legalistic terms that the Insurer settle the case, it amounts to no more than what the Assured could do after the event with the result being determined, not by the fact a demand was made, but by the absence or presence of requisite good or bad faith, prudence or imprudence, as the case might be." [11]

Assuming *arguendo*, however, that National is correct in its contention that Lucas was the agent of O'Daniel by virtue of the "arrangement" between Lucas and O'Daniel, and that another attorney could effectively represent O'Daniel for the excess, National's argument must fall of its own weight. At the moment O'Daniel demanded settlement (whether in person or by his other attorney, Jones) while National refused to settle, a conflict of interests arose between Lucas's two clients. He could not, ethically, continue to represent them both—he must withdraw from the case with regard to one or the other. This he did, by calling Clayton Jones on behalf of O'Daniel. At that moment he ceased to be O'Daniel's agent, and it was not until after that time that National, through its agent Lucas, acquired the knowledge that a settlement offer of $8,500 could be made, for it was not until after that time that Hoth informed Lucas that he would go as high as $6,500. We hold that there is ample evidence to support the findings of the district court that National was guilty of bad faith in failing to settle within the policy limits.

■ National contends that this action cannot be brought until the estate has paid the excess judgment. Although there is conflict among the authorities on this question, the more modern and better reasoned view is that the cause of action arises when the insured incurs a binding judgment in excess of the policy limits.[12] Likewise, we see little merit in the contention that the estate has not been damaged beyond its value, even though the judgment may exceed the value of the estate by more than one hundred per cent. It is obvious that if National were to reimburse the estate for the value of the assets paid to Jessen, Jessen could levy on the estate for the reimbursement money and there would still be no assets left in the estate. This also disposes of the contention that Jessen is the real party in interest and is not a proper party. The estate is the party that was damaged by the personal injury judgment, and the estate is the party that brought the cross-complaint against National.

11. Id., at 532.

12. See, e. g., Brown v. Guarantee Ins. Co., 155 Cal.App.2d 679, 319 P.2d 69, 66 A.L.R.2d 1202 (2d Dist.1957).

There is no merit in the cross-appeal. We agree with the trial court that if National had acted in good faith and the case had been settled, the estate would have been out $2,000.00. We see no reason why the estate should receive a windfall because National did not act in good faith. In short, appellee and cross-appellant has failed to show that the estate was damaged more than $23,-000.

Judgment affirmed.