FETTER LIVESTOCK COMPANY, a corporation, Plaintiff,

v.

NATIONAL FARMERS UNION PROPERTY AND CASUALTY COMPANY, a corporation, Defendant.

Civ. No. 515.

United States District Court
D. Montana,
Billings Division.

Aug. 16, 1966.

Doepker & Hennessey, Butte, Mont., and Joseph P. Hennessey, Billings, Mont., for plaintiff.

Lowell White, Denver, Colo., and Wiggenhorn, Hutton, Schiltz & Sheehy, of Billings, Mont., for defendant.

## MEMORANDUM OPINION

JAMESON, Chief Judge.

Plaintiff, Fetter Livestock Company, is a family corporation operating a farm and ranch near Harlowton, Montana. In a Montana state court Richard Vogel was awarded a judgment of $80,000 against Fetter Livestock Company for personal injuries sustained on the farm premises on August 10, 1960, when a burning barn exploded, casting burning debris upon Vogel and Wallace Fetter, president of the corporation. This judgment was affirmed by the Supreme Court of Montana on August 11, 1964. 144 Mont. 127, 394 P.2d 766.

The defendant, National Farmers Union Property and Casualty Company, had issued a policy of liability insurance to the plaintiff corporation, with a limit of liability of $50,000. National has paid the full amount of its liability under the insurance contract. In this action plaintiff seeks recovery of the amount of the Vogel judgment in excess of the policy limits for negligence and bad faith in failing to settle the personal injury suit within the policy limits.

The facts relative to the accident and resulting injuries to Vogel were summarized by the Supreme Court of Montana as follows:

"Prior to the time of the accident, 5:00 p. m. in the evening, plaintiff, Richard Vogel, who was employed as a railroad engineer and was engaged in part-time ranching also, had come to Montana from North Dakota, where he was a resident, for the purpose of looking for a ranch or farm that he might be interested in purchasing. Plaintiff arrived at the Fetter ranch on August 10, 1960, with his wife and a real estate agent. Plaintiff then left the ranch home and went to the scene of a hay-stacking operation, about one mile away from the ranch home so that he could talk to his aunt, Hilda Fetter Morris, also the mother of Wallace Fetter, about the places that he had seen that day and also the ones that he should look at yet.

"Upon arriving at the place where the hay was being stacked, plaintiff climbed upon the haystack and helped the others in completing the work and also discussed with his aunt the places he had seen. Plaintiff was there from one-half to one hour when smoke was seen rising from the location of the ranch buildings. Several of the people there, including plaintiff and Wallace Fetter, went to the scene of the fire.

"When they arrived, a barn was burning. Immediately, Wallace Fetter inquired of persons standing nearby whether the 'dynamite' had been removed. He was informed that it had. Testimony at the trial showed that, in fact, 'dynamite' had been removed, but there was a conflict as to whether it was 'ditching dynamite' or 'black powder' sticks. Just before the fire started there were four kinds of explosives in the barn: ditching dynamite, black powder sticks, dynamite caps, and garden fertilizer. Wallace Fetter knew of the presence in the barn of these materials but there is some dispute as to whether he knew of the explosive char-

acter of the fertilizer when subjected to a high temperature and burning within a confined space. Plaintiff had no knowledge of what was in the burning building.

"After inquiring about the dynamite Wallace Fetter attempted to start a gasoline pumping unit in order to pump water on the fire. Plaintiff assisted Fetter. In trying to connect the hose to a pipe on the motor, Fetter discovered that they were not the same size. Thereupon, Fetter took off his shirt and threw it to plaintiff asking him to stuff the shirt around the pipe and hose junction in order to seal the escape of water. While plaintiff was in the act of stuffing the shirt around and into the pipe a violent explosion occurred. The explosion threw the barn completely into the air and scattered burning debris in a wide area. The north wall fell upon plaintiff and Fetter, trapping them under the burning wall.

"Both plaintiff and Fetter were seriously burned in the accident and were hospitalized. Plaintiff could not work for over a year because of his injuries, but after one year he did return to work for the Northern Pacific Railway Company as an engineer. Three doctors testified as to his permanent disability. One said in examining plaintiff just before he went back to work, that he did not find any limitation of motion or other disabilities to prevent plaintiff from pursuing his occupation as an engineer. The other two doctors testified that plaintiff was going to suffer from a permanent disability of 30–40 percent." (144 Mont. 129–131, 394 P.2d 767).

There is no contention that National did not make an adequate investigation of the accident and Vogel's resulting injuries. It is clear from the record that a thorough investigation was made through interviewing witnesses and pretrial discovery, including depositions of three physicians. Rather, plaintiff contends that as a result of the information developed through its investigation, National knew:

"(a) Because of the severity of the plaintiff's injury, any verdict was likely to be greatly in excess of the policy limits.

"(b) The facts in the case indicated that a defendant's verdict on the question of liability was extremely doubtful.

"(c) That the company policy was to give equal consideration to the rights of the insured as well as the rights of the company.

"(d) That National had the duty, in the exercise of good faith on its part, that it was obligated to make up its own expert opinion on the question of and the amount of a settlement." (Plaintiff's Post Trial Brief.)

*Settlement Demands and Negotiations in State Court Action*

In June, 1961, counsel for Vogel submitted to National a brochure containing statements of the injuries sustained by Vogel and photographs taken shortly after the accident, and claiming permanent disability and damages in the sum of $600,000. National wrote counsel for Vogel to ascertain their settlement figure and was advised that Vogel would accept the policy limit, whatever amount that might be. Suit was filed in state court on March 9, 1962, for $320,000.[1]

Service of summons and complaint was made upon Fetter Livestock Company on March 12, 1962. On March 15, 1962, John C. Sheehy, attorney for National, sent a so-called "excess letter" to Wallace Fetter, president of Fetter Livestock, calling attention to the fact that the amount demanded in the complaint, $320,000, was "far in excess" of the available insurance coverage, and stating that, "The Fetter Livestock Company has the right, if it desires to do so, to hire an attorney to represent it in this litigation insofar as this excess is concerned."

---

1. At the time of trial the prayer of the complaint was amended by reducing the amount to $220,000.

The letter stated further that if the company decided to select an attorney to represent it for the excess, National would make available its files to the attorney and keep him informed regarding the progress of the litigation.

Shortly thereafter Fetter Livestock Company retained Messrs. Doepker and Hennessey. On March 27, 1962, Joseph P. Hennessey informed Mr. Sheehy that this firm was representing Fetter Livestock Company. Thereafter Mr. Sheehy kept this firm fully informed regarding the further investigation of the accident, discovery proceedings, and settlement negotiations.[2]

Most of the facts relating to settlement negotiations between counsel for Vogel and National and its counsel are undisputed. It seems advisable to set forth the negotiations in chronological form before considering the contentions of the respective parties.

On April 24, 1962, counsel for Vogel wrote Mr. Sheehy that, "If you will show us an insurance policy effective on the date of Mr. Vogel's injuries, with policy limits of $50,000, we offer to settle the case against Fetter Livestock Company for $48,000. (Ex. 24.)

Apparently there were no further settlement proposals until February 18, 1963, when counsel for Vogel wrote Mr. Sheehy that Vogel had given them authority to settle for $43,000, plus medical benefits coverage of $2,000. (Ex. 26.)

On April 4, 1963, Mr. Sheehy wrote National summarizing his conclusions regarding liability and the damages sustained by Vogel. With respect to liability, Mr. Sheehy concluded that, "Under the circumstances we would have to say that the chances are greater than even that liability might be determined because of the presence of the dynamite, although it may not have exploded first." With respect to damages the letter stated that medical and hospital bills totalled $5,912.40, to which should be added probable wage loss from August 10, 1960, to September 15, 1961, in the sum of $12,000. The letter continues:

"In addition to the above items Dr. Balkin estimates that repair plastic surgery would cost from $3,000 to $6,000 and finally selected the sum of $5,000; and that hospitalization would take about ⅓ of this or an additional $1,700.00. However, no arrangement has been made specifically for any plastic surgery, nor do we find the cosmetic damage to Mr. Vogel to be as great actually as you might picture it. From our association with him we find him to be a well balanced person of happy disposition now and apparently with no real discomfort because of the disfigurement to his features. We seriously doubt that he would ever undertake the long period of plastic surgery that would be required to repair his ears, especially since Dr. Balkin would not guarantee a result on the right ear."

Mr. Sheehy summarized his value of the case as follows:

"In considering what the jury might do in this case, I believe we are entitled to consider the fact that Mr. Fetter was in no way guilty of a vicious or malicious intent to bring about the injuries. It is obvious that he had no fear for his safety at the time of the accident and did not realize that he and Mr. Vogel were exposed to an explosive possibility. I don't think that under the circumstances a jury is going to subject him, a young man with a family, to any serious judgment in the case. In order to give Mr. Vogel the amount of settlement demanded of $43,000, the jury would have to award him more than $25,000 for pain and suffering. I just cannot conceive that the jury will do this. In my opinion a jury will give him enough to pay his bills and to make up for his wage loss and some additional amount for pain and suffering. I therefore consider the case to be worth between

2. There is no contention that National did not keep the insured and its counsel fully informed throughout the investigation and subsequent litigation; nor is there any suggestion of lack of cooperation on the part of the insured.

$17,000 to $20,000 in settlement value. Unfortunately I don't think it can be settled for this amount because the attorneys for the plaintiff have their sights set rather high. But again, in conscience I cannot recommend a greater amount than what I have stated." (Ex. 35.)

National thereupon authorized Mr. Sheehy to offer $15,000, with additional authority to negotiate within Sheehy's recommended figures of $17,000 to $20,-000.

On April 11, 1963, Mr. Sheehy wrote counsel for Vogel making a definite settlement offer of $15,000. (Ex. 30.)

At a pretrial conference in November, 1962, counsel for both parties outlined in some detail their respective contentions regarding liability and damages. Judge Nat Allen, the presiding judge, informally requested each counsel to write him shortly before trial giving counsel's evaluation of the case for settlement purposes and informed counsel that he would then write them expressing his opinion of the value of the case.

On April 11, 1963, counsel for National wrote Judge Allen in pertinent part: "We have extended to the plaintiff's counsel our compromise offer of $15,000, which we feel to be a proper valuation of the case for settlement purposes." To this letter Judge Allen replied on April 12 as follows:

"As I promised at the pre-trial I herewith write you concerning my judgment on a proper settlement in the above case on which you have offered $15,000.00. After reviewing the case of both sides, I think perhaps it ought to be settled on a figure of $19,-000.00, principally because of the strong liability situation which in my judgment will shock a jury into going at least that high." (Ex. 36.)

On the same date Judge Allen wrote counsel for the plaintiff as follows:

"I have now received your settlement figure, being $45,000,[3] and as I said at the pre-trial, I herewith make a recommendation for settlement of this case. My figure is $19,000.00, this because you are bound to get people in Wheatland County with both knowledge of an engineer's wages and the earnings of a rancher, and although your liability will shock a jury into paying you something, still a figure of $45,000 in that county will be more shocking than the injury; in my best judgment you won't get over $19,000.-00 because he is working as an engineer and any person holding a railroad job would conclude your client still has one of the best earning capacities, and in their estimation, better than a rancher's. Then, too, you must remember you are an outsider and Fetter is not, and that's always a difficult factor to overcome." (Ex. 41.)

It is clear from the foregoing that within a week of the beginning of the trial, Vogel had submitted a settlement proposal of $43,000; National, on behalf of Fetter Livestock Company, had submitted an offer of $15,000; and Judge Allen advised both counsel that in his opinion the case had a settlement value of $19,000.[4]

---

3. The letter from Vogel's counsel to Judge Allen reads in pertinent part:

"We have conferred with Mr. Vogel at length about this matter, and he states that the least he will accept in the present action is $43,000.00. In addition, he would insist that the settlement include $2,000.00 in medical pay coverage on a farm liability policy carried by the Fetter Livestock Company to which he believes he is absolutely entitled, but has not received, for a total of $45,000.00." (Ex. 28.)

4. Mr. Sheehy transmitted a copy of Judge Allen's letter to National on April 15, 1963, with this comment:

"We think that this letter is important in view of the fact that settlement demand has been made upon us that we settle the case for $43,000. If Judge Allen, having received information from both sides in the case, and having heard the pretrial conference, assesses a valuation of $19,000 to the case, it certainly appears to be reasonable that we resist the demand of the insured to settle at the very high figure being submitted by the plaintiff at this time." (Ex. 35).

*Requests By Fetter Livestock Company
And Its Attorneys To National To
Settle Within Policy Limits*

Wallace Fetter testified on direct examination that on several occasions he requested Mr. Sheehy to settle within the policy limits and in particular on November 7, 1962, asked Sheehy to offer $25,000 or $30,000 and try and settle out of court.[5] He testified further that during the trial the jury appeared to be sympathetic with the plaintiff's case, that several of the women jurors wept, and that he made a further request that the case be settled within the policy limits.

On the other hand, Fetter testified on cross-examination that he did not feel he was liable or responsible for the accident and so expressed himself to Mr. Sheehy;[6] that he knew of Judge Allen's suggestion that the case be settled for $19,000, and that the offer submitted by Vogel's attorneys was approximately $43,000 plus $2,000 medical; that he "probably thought this was too much to pay"; that while "at the present time I see things in a bit of different light", he was still of the opinion that he was not responsible for the accident.

On April 2, 1963, Joseph P. Hennessey, one of the counsel for Fetter Livestock Company, wrote Mr. Sheehy as follows:

"It is our understanding that the above captioned case can be settled at this time within the limits of the insurance coverage.

"After a careful consideration of all the facts it is our opinion that the case should be settled and we hereby demand that you negotiate and settle the case with the plaintiff.

"The continuation of this litigation is affecting the health of Mr. Fetter.

"We wish to call to your attention the telephone conversations between you and M. F. Hennessey of Butte, Montana and pursuant thereto hereby state that in the event this case is permitted to go to trial we will hold your insurance company liable for any judgment that may be obtained in excess of the policy limits.

"We are willing to cooperate with you and your company in any manner consistent with the rights of the Fetter Livestock Company. We will, however, if the case is tried hold the Company liable for all costs incurred by the Fetters as a result of this litigation." (Ex. 29).

On April 17, 1963, during the trial in state court, there was served upon Mr. Sheehy, a "notice and demand", directed to National Farmers Union Property & Casualty Co., and John C. Sheehy its attorney, reading as follows:

"TO NATIONAL FARMERS UNION PROPERTY & CASUALTY CO., and JOHN C. SHEEHY, its Attorney:

"Because of the evidence now before the Court as to the actual damages sustained by the plaintiff, and because of the possibility of a directed verdict on behalf of the plaintiff, we do not feel that your offer of a settlement in the sum of $19,000.00 is adequate. We therefore demand that you make another offer of settlement in this matter within the limits of the policy, bearing in mind the foregoing facts.

"Dated this 17th day of April, 1963.
(Signed) Joseph P. Hennessey"

---

5. Mr. Sheehy testified that Fetter said he thought $10,000 to $20,000 would be enough to pay in settlement.

6. Fetter testified in pertinent part:
"Q * * * Isn't it true at all times you felt you were not liable and responsible for this accident?
A I don't think I was.
Q You don't think you were responsible for it?
A No, not under the circumstances.
Q All right. So that in your discussions with Mr. Sheehy you expressed yourself that way, that you did not feel you were responsible for this accident?
A Yes.
Q And you were resentful over the fact that your cousin had brought the action against you?
A Yes."

It is clear that National would have paid the amount of $19,000 suggested by Judge Allen.[7] It is equally clear that Vogel was unwilling to accept that amount.[8]

### Applicable Law

■■ Both this court and the Court of Appeals for the Ninth Circuit passed upon questions relating to recovery for bad faith in the failure of an insurer to settle within the policy limits in Jessen v. O'Daniel, D.Mont.1962, 210 F.Supp. 317, aff'd National Farmers Union Property & Casualty Co. v. O'Daniel, 9 Cir. 1964, 329 F.2d 60. Counsel for defendant make no reference to either case in a rather exhaustive post-trial brief, but cite numerous cases from other jurisdictions, both federal and state. In turn counsel for plaintiff analyze and distinguish many of those cases, and cite others in support of their contentions. I see no reason to discuss these cases. In my opinion the applicable rules in this jurisdiction are set forth in Jessen v. O'Daniel, supra, and National Farmers, etc. v. O'Daniel, supra, and the cases there cited. It is clear that each case must be decided on its own particular facts.

It is well settled that "Error in judgment in not settling a case within the policy limits is not in itself sufficient to impose liability upon the insurer for any recovery in excess of the limits; nor is the mere fact that the insurer was unsuccessful in the trial of the case sufficient to show that the defense was not made in good faith." Jessen v. O'Daniel, supra. (210 F.Supp. at 325.) On the other hand, "It has been held that a policy of this type places a fiduciary duty on the insurance company to look after the interests of the insured as well as its own, thus requiring it to consider fairly the insured's liability for the excess when evaluating an offer of settlement within the policy limits. Failure to do so is bad faith and renders the company liable for its breach of fiduciary duty in the amount of any judgment over the policy limits." National Farmers Union Property & Casualty Co. v. O'Daniel, supra. (329 F.2d at 64–65.)

■ In Jessen v. O'Daniel this court set forth relevant factors for determining whether an insurer acts in "bad faith" as follows:

"Factors to be considered include (1) whether, by reason of the severity of the plaintiff's injuries, any verdict is likely to be greatly in excess of the policy limits; (2) whether the facts in the case indicate that a defendant's verdict on the issue of liability is doubtful; (3) whether the company has given due regard to the recommendations of its trial counsel; (4) whether the insured has been informed of all settlement demands and offers; (5) whether the insured has demanded that the insurer settle within the policy limits; (6) whether the company has given due consideration to any offer of contribution made by the insured. As a rule no one factor is decisive. All must be considered in determining whether the insurer acted in good faith." (210 F.Supp. at 326–327).

Factors (3), (4) and (6) are not present in this case. It is clear that National gave due regard to the recommendation of its counsel and followed that recommendation. The insured and its counsel were kept fully informed. No offer of contribution was made by the insured. Factors (1), (2) and (5) must be considered in determining whether National acting through its claim manager and its local counsel breached its fiduciary duty

---

7. While plaintiff argues that the only definite offer was $15,000, the evidence as a whole supports a finding that prior to trial Mr. Sheehy asked counsel for plaintiff where there was any chance that the case might be settled "at or near the figure suggested by Judge Allen".

8. Bruce Bair, one of the attorneys for Vogel, testified: "Our client would not have taken $19,000, if that is what you want to know." `

to its insured and was guilty of bad faith in failing to settle for Vogel's demand of $43,000.

### Testimony of Sheehy and Hoth

Any bad faith on the part of National in failing to settle within the policy limits must be predicated upon the judgment, recommendations, and action of Mr. Sheehy, the company's trial counsel, and Robert C. Hoth, its assistant claims manager and suit examiner.

Mr. Sheehy is a competent trial lawyer with extensive experience in representing both plaintiffs and defendants in personal injury actions. During the ten years preceding the trial of the Vogel action he had tried 25 or 30 cases for National and handled other cases which were settled. National had found that it could rely upon his judgment. Mr. Hoth is a lawyer employed by National since 1952 and has occupied the position of assistant claims manager since 1954. The company has an inventory of somewhere between 180 and 200 lawsuits, opening and closing approximately ten each month. Mr. Hoth was familiar with this case from the time of the initial investigation shortly after the accident.

Mr. Sheehy's evaluation of the case approximately two weeks before the trial was set forth in his letter to National dated April 4, 1963 (Ex. 35), portions of which are quoted supra. Mr. Sheehy was interrogated at length regarding the contents of this letter as well as subsequent developments at the trial.[9] He testified that by reason of developments at the trial (particularly in the testimony of the Sheriff of Wheatland County regarding the dynamite) he thought there would be a defendant's verdict,[10] and that if there were a verdict for the plaintiff it would "not be a large verdict".[11]

Mr. Hoth was also interrogated in detail regarding the April 4 letter and testified that he reviewed the file upon receipt of the letter and thought Mr. Sheehy was "correct in his analysis". John Mora, state agent for National, was present at the trial and reported to Mr. Hoth once during the progress of the trial. Hoth thought the developments reported by Mora were favorable and that the settlement authority extended was ample.

Both Sheehy and Hoth testified that the policy limits had nothing to do with their evaluation of the case for settlement purposes. In this connection it may be noted that this is not a case where the policy limits are low and the settlement demand is the limit of the policy (or within a few hundred dollars of that amount), so that the risk of an excessive verdict is borne almost entirely by the insured. On the basis of the $43,000 demand National would have saved $7,000 plus several thousand dollars in costs and fees for trial and appeal. In other words, it was taking a substantial risk itself in its decision not to settle for the amount demanded. This tends to confirm Hoth's testimony that National considered plaintiff's interest equally with its own.[12] Sheehy also testified that the rights of the insured were considered at all times.

---

9. Sheehy explained in detail the reasons for his conclusions. The cross-examination consisted in large part of counsel for plaintiff reviewing the evidence favorable to Vogel and Sheehy in turn pointing out the evidence favorable to Fetter Livestock Company on which he relied.

10. Mr. Sheehy testified on cross-examination:
    "Q Having all these facts before you, did it not appear to you that as a reasonable defendant, that an effort should be then and there made because the company had a duty to protect their insured, to accept the $43,000 offer and settle the case?

"A No. Let me say that at all times, as has been stated here before, I was hoping for a defendant's verdict. That was true at all stages of the trial."

11. Mr. Sheehy testified on cross-examination that this was his opinion at all times during the trial and was his opinion "while waiting for the jury".

12. Hoth testified on cross-examination:
    "Q Well, actually let's go back from this time of the trial to the policy of Farmers concerning their thought as to whether their insured had the right to

Sheehy testified further that during the trial he asked counsel for Vogel whether there was any chance that plaintiff would "move off" the $43,000 demand, and "they said no."

### Letters from Judge Allen

It is significant that the trial judge within two weeks of the trial suggested a settlement figure of $19,000. It is true, as counsel for plaintiff contend, that he was not as familiar with the case as counsel for either party. On the other hand, it does appear that at the pretrial conference counsel for both parties outlined rather fully their respective contentions regarding liability, injuries and damages, and submitted exhibits, including pictures of Vogel following the accident.[13] Counsel for plaintiff argue that Judge Allen obviously changed his mind after he heard the case, because he "held without hesitation that the evidence supported the verdict on the motion for new trial". The conclusion that he changed his mind regarding the value of the case for settlement purposes does not necessarily follow. His denial of the motion for a new trial simply meant that he found there was substantial evidence to support the verdict of the jury.

### Demand for Settlement

It is undisputed that Wallace Fetter orally requested Mr. Sheehy to settle the case.[14] Sheehy's testimony that Fetter agreed that the $43,000 demand was too high was confirmed by Fetter's own testimony on cross-examination. Fetter testified further that he did not feel at any time, even at the time of the trial of this action, that he was responsible for the accident.

Mr. Hennessey, counsel for Fetter, submitted two demands in writing that the case be settled within the policy limits— one by letter on April 2, 1963, and the other by notice during the trial. No amount was specified in either demand, except that in the notice served during the trial, the statement was made that Fetter and his counsel did not feel that the offer of $19,000 was adequate.

Mr. Hennessey testified that when he observed that the jury included a number of retired or unemployed railroad men, he felt that it would be sympathetic to Vogel, who was a member of the Railroad Brotherhood; that he made repeated efforts to get counsel for the insurance company "to make a more realistic offer than $15,000", as he felt that if they did plaintiff would have lowered his demand for $43,000. On one occasion during the trial he told Mr. Sheehy that if Sheehy could get authority to pay in the neighborhood of $35,000 he felt he could go to plaintiff's attorney and get them to lower their demands. In his opinion $35,000 would have been a fair figure. Hennessey testified further that, "Mr. Sheehy felt he could prevail on the jury to bring in a verdict for the defendant."

### Testimony of Vogel's Counsel

Bruce B. Bair of the North Dakota Bar, one of Vogel's counsel, testified that they valued the case in the neighborhood of $100,000 or more, but knew there was only $50,000 insurance and accordingly were making an effort to settle within that amount. The lowest settlement demand was $43,000, and counsel made it plain that they did not have authority to go below that amount. Any further of-

---

equal consideration with the insurance company?

"A We did give every consideration we can to his interest as insofar as they are compatible with the interest of every other policy holder. In other words, yes, we give it equal consideration at least.

"Q And that is what you are supposed to do, isn't it?

"A That is correct."

13. The pretrial order filed in the state court action contains a transcript of the

proceedings at the pretrial conference, which includes detailed statements of counsel for both parties and questions by the court with respect to contentions regarding the facts surrounding the accident, the applicable law, and the injuries sustained by Vogel.

14. As noted supra, Fetter testified that he asked Sheehy to offer $25,000 to $30,000, while Sheehy testified the amount suggested was $10,000 to $20,000.

fers received from National, however, would have been submitted to Vogel for his consideration.

Robert Vogel, who was also counsel for the plaintiff Vogel in the state court action, testified that he had represented many insurance companies, as well as plaintiffs in personal injury litigations, and that he felt the offer of $15,000 submitted by National in this case was "ridiculously small". He testified further that they made it clear to Mr. Sheehy that Vogel's lowest figure was $43,000 plus the $2,000 medical, but they would be willing to go back to their client if another offer were made.

While Mr. Hennessey was of the opinion that an offer of $35,000 might have been considered by Vogel, there is no testimony that Vogel or his counsel ever suggested a figure less than $43,000.

### Conclusion

The briefs of counsel for both parties set forth the evidence on liability, injuries and damages favorable to their respective contentions. No useful purpose would be served in detailing this evidence, which was summarized by the Montana Supreme Court in Vogel v. Fetter Livestock Company, supra. It is clear that Vogel sustained very serious injuries. Quite naturally plaintiff in this action tends to magnify those injuries, and defendant to minimize them. There was a conflict in the evidence regarding the removal of dynamite (and the inferences which might properly be drawn from the evidence) and in the medical testimony regarding Vogel's permanent disability. Obviously the jury accepted the testimony favorable to Vogel, and both the trial and appellate courts found the evidence sufficient to sustain the verdict.

Messrs. Sheehy and Hoth were mistaken in their judgment with respect to what verdict might be returned by the jury. They were also mistaken with respect to the applicable law. Both courts and attorneys, however, may differ on the law applicable to a given state of facts. In retrospect it is clear that it would have been to the advantage of both the insured and the insurer to have accepted the settlement demand of $43,000. But neither the fact that National and its counsel erred in their judgment nor the fact that the defense of the action was unsuccessful is in itself sufficient to impose liability upon National for recovery in excess of the policy limits. We are concerned with whether National acted negligently and in bad faith and did not give proper consideration to the rights of its insured in refusing to pay the settlement demand of $43,000.

The facts surrounding the accident had been thoroughly investigated. There had been extensive pretrial discovery. National relied upon the advice and recommendation of competent and experienced counsel who was thoroughly familiar with the case, had talked with the officers of the insured corporation and all other known witnesses, and had seen the plaintiff Vogel. He had submitted a detailed report to National, and its claim examiner had reviewed the file and concurred in his judgment.

The officers and stockholders of the insured corporation, including Wallace Fetter, who was also seriously injured in the accident, did not feel that the insured was responsible for the accident and resulting injuries. While they expressed a desire for settlement, partly because of Wallace Fetter's physical condition, Fetter told Sheehy he thought $43,000 was too high. The trial judge, following a pretrial conference and shortly before trial, advised both parties that in his opinion the case had a settlement value of $19,000. While National could not rely upon the opinion of its insured regarding liability or the opinion of the trial judge regarding the value of the case as a defense in this action, these are factors which may properly be taken into consideration in determining the issue of good faith.

After reviewing all of the evidence and giving due consideration to all relevant factors, I conclude that plaintiff has

failed to establish negligence or bad faith on the part of National in its handling of the defense of Vogel v. Fetter Livestock Company, including its failure to pay the settlement demand.